OPINION OF THE COURT
Matthew F. Cooper, J.
Divorced more than a decade ago, the parties, along with their two grown children, have been relentlessly litigating against one another ever since. The case is now before me on a series of postjudgment matrimonial motions brought by the ex-husband, Arie Genger, against the ex-wife, Dalia Genger.
The issue in all three motions is which ex-spouse owns a stock purchase agreement (the SPA) that was used by Arie to sell shares of a company he owned to the parties’ son, Sagi Genger. The SPA is also the subject of a lawsuit between Arie and Sagi in which Arie seeks to collect payment from his son on the instrument.
Arie contends that the SPA is his separate property. Dalia asserts that the SPA is a nonliquid marital asset and, pursuant to the terms of a stipulation of settlement, which was signed by the parties on October 26, 2004 and was incorporated into the judgment of divorce dated January 14, 2005, is subject to distribution by way of a coin toss. As a result of having unilaterally conducted the coin toss on January 5, 2015, Dalia further contends that the SPA now belongs to her. In each of the motions, Arie seeks a finding that the coin toss was invalid and that the instrument belongs to him.
Background
What is notable about the motions is not so much the SPA, it being of little value relative to the parties’ overall wealth. Rather, it is that the motions are just one more installment in what has been described as the “Genger family’s litigation saga” (Genger v Genger, 76 F Supp 3d 488, 491 [SD NY 2015]), with the parties and their two children continually suing one another personally and through their various family-held businesses. A Westlaw search reveals that the Gengers’ lawsuits against each other have resulted in almost 40 reported deci *928 sions from the New York State Supreme Court and the Federal District Court for the Southern District of New York. Of the state court decisions, at least 10 have been from the Appellate Division, First Department. There has also been extensive litigation in the Delaware state courts, as well as countless unpublished decisions and orders from trial judges in the Matrimonial and IAS Parts of this court.
As other judges have lamented, the “bitter and seemingly endless battle” (Glenclova Inv. Co. v Trans-Resources, Inc., 874 F Supp 2d 292, 295 [SD NY 2012]) between the family members, which pits Dalia and Sagi against Arie and the couple’s daughter, Orly Genger, results, in large part, from the divorce itself. In one of the Genger family cases that was before her, Federal District Judge Katherine B. Forrest stated:
“As Tolstoy famously wrote, ‘Happy families are all alike; every unhappy family is unhappy in its own way.’ Leo Tolstoy, Anna Karenina 1 (Constance Gar-nett trans., 1978). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Da-lia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other’s lives as miserable as possible” (Genger, 76 F Supp 3d at 491).
In a decision rendered in February of this year after a 27-day trial in one of the many lawsuits that Orly and Sagi have brought against each other in New York County Supreme Court, Justice Barbara Jaffe wrote: “The parties are siblings; their family has been mired in litigation in several jurisdictions for many years, all inspired by the contentious divorce of the parties’ parents. This action reflects the parents’ enmity which has malignantly spread to their children” (Genger v Genger, 2016 NY Slip Op 30219[U], * 1 [Sup Ct, NY County 2016]).
Despite having more money than they could ever hope to spend, the Gengers’ interminable battle over who gets what has resulted in the two family camps having no relationship with one another; the only contact the siblings have with each other and each parent has with the child with whom he or she is not aligned is when they are in a courtroom litigating. *929 Perhaps the saddest manifestation is that Arie has never seen his grandchildren. One gets the sense that this may indeed be a case where it really is not about the money; it is about a dysfunctional family where each member is intent on inflicting as much pain as possible on his or her ex-spouse, parent, child or sibling.
The Gengers have the right, of course, to make each other as miserable as they want. The problem is that the method they have chosen adversely impacts the court system and the people it serves. Litigation like the type the Genger family members have engaged in over the last decade — litigation that knows no bounds and is brought to inflict punishment on former loved ones as much as it is to resolve actual claims — demands a disproportionate share of already limited judicial resources. The result is that litigants who lack the resources to command a “small army of lawyers,” but often have claims equally or more pressing than the Gengers’, find themselves receiving less time and attention from the courts than their cases deserve.
Statement of Facts
According to Justice Jaffe’s trial decision, quoted above, much of the blame for making the Gengers a family whose raison d’etre is to sue one another rests with Arie and Dalia’s decision to have Sagi take an active role in arriving at the terms of the divorce stipulation. To make matters worse, the stipulation provided that Sagi was to be appointed attorney-in-fact so that he could allocate nonliquid marital assets to his mother and father in order to effectuate an equal distribution of those assets. Predictably, this proved highly problematic, with Arie, joined by Orly, charging that Sagi was making allocations solely to benefit Dalia, and in turn, Sagi himself.
The SPA is but one tiny sliver of the family’s financial pie. Dated March 8, 2004, it requires Sagi to make payments each year to Arie in exchange for Arie having transferred to him 100 shares of common stock of AG Real Estate GP, Inc., a company used by Arie in connection with the family’s Canadian real estate investments.
Notably, the value of the SPA is only worth the amount that Arie will obtain by suing his son on the instrument, there being no indication that Sagi will ever pay voluntarily. At oral argument, both sides conceded that the very most Arie could hope to realize is $300,000. Moreover, if things proceed the *930 way they have, it will presumably be years, along with hundreds of thousands of dollars in additional legal fees, before he gets a penny. On the other hand, if Dalia was granted ownership of the SPA, it can safely be assumed that she would waive enforcement of the instrument against Sagi, thereby relieving the child with whom she is aligned from having to make the required payments.
The “coin toss” provision, which is found in article II of the stipulation (Distribution of Assets), states that if the parties have not sold or divided a nonliquid marital asset by the second anniversary of the stipulation, and are then unable to reach an agreement as to its disposition within 45 days of the anniversary date, a coin toss will be held to determine the value of the asset and which party owns it. The stipulation sets out the procedure for the coin toss with the same type of detail one would expect from the rules governing the coin toss at the National Football League’s Super Bowl.
The second anniversary of the stipulation was October 26, 2006, a date that passed without the SPA being sold or divided. Similarly, no agreement was reached as to the disposition of the SPA by December 10, 2006, that being the 45th day following the two-year anniversary date. Despite the absence of a sale, division, or agreement as to the disposition of the instrument by either of the trigger dates, there was no demand by either party for a coin toss. In fact, the purported coin toss did not take place until more than nine years later when, on January 5, 2015, Dalia unilaterally conducted the event without her ex-husband’s participation. As a result of having done so, she now claims ownership of the asset.
Dalia’s decision to move forward with the coin toss after so many years was not the result of whim or happenstance. Instead, it was precipitated by the Appellate Division rendering a decision on December 4, 2014, in Genger v Genger (123 AD3d 445 [1st Dept 2014]), one of a multitude of Genger appeals before it. This appeal, which pitted Arie against Sagi and Dalia, stemmed from a decision by Justice Cynthia S. Kern, another Supreme Court Judge who has handled Genger cases. Although she found that Arie owned the SPA, she denied summary judgment to him in his effort to collect against Sagi on the instrument and on three promissory notes. The Appellate Division reversed the denial of summary judgment and remanded the matter to Justice Kern for “a calculation of the amount of damages owed to Arie under the stock purchase *931 agreement,” as well as a “calculation of the simple interest owed to him in accordance with the terms of [the] notes . . . and the stock purchase agreement” (Genger at 447-448).
While Arie construed the Appellate Division’s decision as a clear acknowledgment that he owned the SPA, Dalia apparently viewed certain language used in the decision as reason for her to demand the coin toss. On December 22, 2014, two weeks after the decision, one of Dalia’s matrimonial attorneys, Judith Bachman, Esq., sent notice to one of Arie’s attorneys, Edward Klimerman, Esq., notifying him that the long-delayed event would take place on January 5, 2015. Despite being advised by a letter from Arie’s matrimonial attorney, Robert Z. Dobrish, Esq., that Arie objected to the coin toss and would not participate, Dalia proceeded with the toss on January 5th without Arie being present. Although the stipulation specifies that “the coin will be tossed in the air by Orly Genger, or in her absence by a person mutually acceptable to the Husband and the Wife,” neither Orly nor a “mutually acceptable” person tossed the coin on January 5, 2015. Instead, it was done by one of Sagi’s lawyers, John Dellaportas, Esq., of Morgan, Lewis & Bockius, LLP, who was presumably properly attired for the task in a head referee’s striped jersey and white cap.
As one would imagine, these events gave rise to another round of frenzied motion practice. Arie brought the series of motions that are the subject of this decision, and he moved before Justice Kern, pursuant to the Appellate Division’s decision remanding the case to her, for judgment against Sagi on the SPA. Dalia, in turn, cross-moved for summary judgment declaring her to be the instrument’s rightful owner.
Naturally, I would have preferred if Justice Kern had decided the coin toss issue, thereby subjecting her decision, rather than mine, to the inevitable appeal. She, however, in a decision dated February 26, 2015, ruled that “the determination of whether the coin toss was valid should be made by the Honorable Matthew Cooper in the matrimonial part” (Genger v Genger, 2015 NY Slip Op 32583 [U], * 6 [Sup Ct, NY County 2015]). In making the referral, she reasoned that this was ultimately a decision to be made within the context of the post-divorce proceeding, especially in that the ex-husband had already moved before me to set aside the coin toss as invalid. In the end, the coin toss issue, like just about everything in the world of the Gengers, goes back to the divorce itself. Thus, it is appropriate for the issue to be decided in a matrimonial part.
*932 Legal Analysis
In support of their quest for ownership of the SPA, both sides look to this stand-alone, single-sentence paragraph, from the Appellate Division’s December 2014 decision: “To the extent the notes and stock purchase agreement were considered ‘non-liquid assets,’ subject to a ‘coin toss’ procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him” (Genger, 123 AD3d at 446).
More precisely, each side looks to one or the other of the two clauses comprising the sentence. Dalia points to the sentence’s dependent clause, consisting of these words: “To the extent the notes and stock purchase agreement were considered ‘non-liquid assets,’ subject to a ‘coin toss’ procedure set forth in the divorce settlement.” According to Dalia, by including this language in the sentence, the Appellate Division authorized her to proceed with the coin toss, which resulted in her obtaining ownership of the SPA. Arie, on the other hand, focuses on the independent clause, which consists of these words: “Arie owns the instruments and the debts are owed to him.” According to Arie, this was a definitive declaration by the Appellate Division that he owns the SPA.
The problem with each side’s textual analysis is that it disregards the need to look at the sentence as a whole rather than just the individual clauses of which it is composed. While the dependent clause refers to the coin toss procedure, it is not a statement by the Appellate Division that the SPA is an asset subject to the procedure. It serves only to introduce and modify the independent clause that follows it; grammatically, it cannot stand on its own as a declaration of anything. Likewise, the statement contained in the independent clause that Arie owns the instruments is not absolute; it is subject to the provisions of the words preceding it.
Because of the wording of the dependent clause, it is impossible to reconcile the two clauses in a way that would result in the sentence as a whole making any sense, particularly when viewed in the context of what the stipulation states. If one substitutes the common meaning for the prepositional phrase “to the extent that,” the sentence would read like this: “[Inasmuch as] the notes and stock purchase agreement were considered ‘non-liquid assets,’ subject to a ‘coin toss’ procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him.” And because it is necessary to give full force and effect as to each word in the sentence’s two *933 clauses, the conclusion to be drawn is that if the SPA is subject to the coin toss procedure, it is Arie’s property. This, of course, is in total conflict with the stipulation. Under the very clear terms of the stipulation, the complete opposite is true: if the SPA is an asset that is subject to a coin toss, then the only way Arie would be able to claim ownership of it is by winning the coin toss. Put another way, absent a coin toss, the only way the SPA can be found to belong to Arie is if it is not a marital asset, and instead, as he asserts, is his separate property. In that case, the SPA would not be subject to equitable distribution by way of the coin toss provision, or, for that matter, by any other method.
With a textual analysis of the crucial sentence proving to be unproductive, the alternative is to look to what the Appellate Division did with regard to the SPA, as opposed to what it said. What it did was remand the matter to Justice Kern for a “calculation of the amount of damages owed to Arie under the stock purchase agreement” (Genger, 123 AD3d at 447). Significantly, it did not remand the matter for a determination as to who owns the SPA or whether it is subject to the coin toss procedure. Moreover, it did not authorize Dalia to proceed with the coin toss. It simply sent the case back for a determination as to how much Sagi owes Arie. To the extent that the Appellate Division acted as it did, it was clearly indicating, by deed if not by words, that it considered the SPA to be Arie’s separate property.
Additional authority supporting the finding that the SPA belongs to Arie comes from a postjudgment matrimonial arbitration decision, which the arbitrator, retired Judge E. Leo Milonas, rendered on May 6, 2008, after hearing 14 days of testimony. With regard to the family’s Canadian real estate investments, he stated the following: “Dalia never had any real or equitable marital interest in the Canadian venture. The arbitrator therefore dismisses Dalia’s AG Properties claim.” According to the decision, what is referred to as “AG Properties” primarily includes the limited partnership that Arie established, AG Real Estate Partners, L.P., of which 90% was owned by Sagi and Orly as limited partners, with the remaining 10% owned by the general partner, AG Real Estate GP, Inc., a corporation owned by Arie. It was the stock in AG Real Estate GP, Inc. that Arie then sold to Sagi through the SPA.
Inasmuch as the SPA consists of shares of the general partner in AG Real Estate Partners, L.P., the partnership at *934 the center of the Canadian real estate investments, it constitutes property that comes within the scope of the arbitrator’s dismissal of Dalia’s “AG Properties claim.” The dismissal is based on the arbitrator’s express finding that “Dalia never had any real or equitable marital interest in the Canadian venture.” Thus, the arbitration decision must be seen as conclusively determining that the SPA was not marital property to which Dalia had an equitable claim.
The fact that Dalia took no action for so many years with regard to the SPA demonstrates that she too regarded the arbitrator’s decision to be a binding determination that she had no claim to the instrument. It was only after Arie sued Sagi on the SPA and the Appellate Division rendered its decision, with its confusing sentence referencing the coin toss, that Dalia was suddenly motivated — after close to a decade of inactivity — to demand and then proceed with the coin toss. The effort, however, was to no avail. Whatever happened when Sagi’s attorney flipped a coin into the air on January 5, 2015 was of no force and effect. This is because the SPA was not, and is not, properly the subject of such a procedure. Although it is a nonliquid asset, the record establishes that it is not a marital asset; instead, the SPA is Arie’s separate property and thus not susceptible to division between the parties by coin toss or other means.
Conclusion
The Genger story is compelling in its own way, as is any story of a family in turmoil. Much like watching a television series about a rich and powerful, but ultimately tragic, family, we marvel at how people can have so much materially, and yet be so incredibly unhappy that they dedicate their lives to suing their own sons, daughters, mothers, fathers, brothers and sisters. But as with most stories like this, there comes a time when it becomes simply tiresome, a time when we have seen far too much of the characters, their constant self-absorption and sense of entitlement, and their incessant troubling behavior.
The same way that a series about an unhappy family must ultimately come to an end, the time for the Gengers continuing to occupy center stage in the New York court system must also end. Recently, our new Chief Judge, Janet DiFiore, unveiled an initiative to curb what she described as “troublesome” inefficiencies in court operations. In an address to the court *935 system’s administrative judges, she stated that she wanted to “make certain that we are putting our resources to our highest and best use” (Jeff Storey, DiFiore Takes First Steps to Fixing State Court Backlog, NYLJ, Mar. 31, 2016 at 1, col 3). It seems obvious that continuing to give the Gengers the exorbitant amount of court time that they demand is not putting our resources to their “highest and best use.”
With the dispute over the SPA having been decided, it is this judge’s hope that the parties and their children might take a step back and reflect on how destructive this path of constant litigation is, not only to them, but to the courts and the other litigants who truly need our services. If they are unable to do so, it may be incumbent on judges and court administrators to devise a method to curb what is becoming perilously close to an abuse of the judicial system.
In light of the foregoing, defendant’s three motions are granted to the extent they seek to have him declared the owner of the SPA and the coin toss is declared invalid.